UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>John Carl Pape,<br><br>    Defendant. | Crim. No. 12-251 (PJS/LIB)<br><br>**REPORT AND RECOMMENDATION** |

This matter came before the undersigned United States Magistrate Judge upon Defendant's motions to suppress evidence obtained as a result of a search and seizure and to suppress statements made by Defendant during an interview. The case has been referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on November 19, 2012 regarding these two suppression motions and both parties' discovery motions in this case.[1] The parties each made their arguments on the record, and the Court permitted each party to file a letter to the Court outlining any additional legal authority upon which the parties relied for their argument. For the reasons outlined below, the Court recommends that both of Defendant's motions to suppress be denied.

## I. BACKGROUND

On May 6, 2012, Eveleth Police received a report regarding two vehicle break-ins earlier in the day, both of which involved stolen property, including two purses, one of which contained a loaded .38 caliber revolver.

Later on the same day, police received information that a credit card stolen from the break-ins had been used at the Target store located in Virginia, MN. The police obtained the

---
[1] The discovery motions were the subject of a separate Order.

1

video allegedly showing Defendant using the stolen credit card at the Target store. Still on May 6, Eveleth Police Chief Timothy Koivunen applied for a search warrant to search Defendant's apartment located at 1705 9th Ave. N. #1, Virginia, MN and the vehicle Defendant was seen driving at the Target store.

Chief Koivunen participated in the execution of the search warrant of Defendant's apartment at approximately 9:05 p.m. on May 6. When the police arrived at Defendant's apartment they made an unannounced entry by kicking-in the door and found Defendant lying down on the floor in the kitchen.[2] Defendant did not appear to be intoxicated, and he was compliant with the police officers. Defendant was arrested, his person searched, and then taken to the St. Louis County jail in Virginia, MN. Defendant was not questioned by anyone at the scene or while he was transported to the jail. Chief Koivunen and the remaining officers searched the apartment and seized numerous items including some of the credit cards that had been reported stolen. During the search, police also uncovered .22 grams of methamphetamine. However, one item the police were unable to find was the loaded .38 caliber revolver that had been reported stolen.

The next morning, at approximately 9:24 a.m., Chief Koivunen travelled to the St. Louis County jail where the Defendant was being held because Chief Koivunen wanted to see if he could obtain more information relevant to the case. Chief Koivunen met with Defendant in the interview room of the jail, which was described as approximately 8 feet by 8 feet in size; it included a table with two chairs and had one sidewall with clear glass.[3] During the interview, Defendant and Chief Koivunen were the only two people present in the room, Defendant was still dressed in the same clothes he wore the previous night. Chief Koivunen was not in uniform

---

[2] Chief Koivunen testified that he believed Defendant was on the floor in order to comply with the police instruction that anyone in the apartment should get down on the ground.
[3] Throughout the interview, no one was present at the glass, nor did anyone intimidating come up to the glass.

2

(he wore dress slacks, dress shirt, and a tie), and Chief Koivunen did not carry his firearm into the interview room.  Prior to commencing the interview with Defendant, Chief Koivunen turned on a tape recorder and recorded the entire interview.

After receiving some basic identifying information from Defendant, such as his name, date of birth, and address, Chief Koivunen provided Defendant with the following warning:

> You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.

(Gov't Ex. 2B at 1).  Chief Koivunen then asked Defendant if he understood the rights that had been explained to him, to which Defendant responded "Yeah."  (Id.)  Chief Koivunen then asked, if after having been read those rights Defendant wished to talk to Chief Koivunen, to which Defendant responded "Might as well."  (Id. at 2).  After Chief Koivunen requested that Defendant clarify and answer either yes or no, Defendant answered "Yes."  (Id.)

During the interview, Defendant, made a request to meet with his girlfriend at the time, Angie: "I want a date with my old lady . . . an hour . . . half an hour . . . a minute."  (Gov't Ex. 2B at 10) (ellipses in original).  Chief Koivunen responded that he would see what he can do: "I will see what I can do about, uh, having her visit with you.  Never done it before, John."  (Id.)  Defendant then express his disbelief: "Ain't never gonna happen.  Whispered promises in a fu**in' back room closet that never come true.  I've heard all the (inaudible)."  (Id.)  Prior to departing, Chief Koivunen said that he would work on it.  At no point during the interview, however, did Chief Koivunen promise to Defendant that he would be able to visit with Angie as a condition for Defendant to answer questions by Chief Koivunen.  Likewise, Chief Koivunen

3

never threatened Defendant that Angie would be unable to visit Defendant if he did not respond to questions.

Chief Koivunen testified that one of his primary interests in conducting the interview with Defendant was to uncover the location of the loaded .38 caliber revolver for the protection of the community. Eventually, Defendant stated that he had hidden the revolver in a hole in the living room wall of his apartment and that it was accessible from the outside of the building. After inquiring as to how to access the revolver, Chief Koivunen concluded the interview, at approximately 9:54 a.m., and headed to Defendant's apartment to attempt to recover the revolver.

At Defendant's apartment building, approximately only a mile away from the jail, Chief Koivunen went to the east side of the building, where he observed a section of the siding that was missing from the outside wall as Defendant had described. Chief Koivunen remained outside of the building at all times and never entered the apartment building or Defendant's apartment. Although Chief Koivunen thoroughly searched the area where Defendant had represented the revolver was hidden, he was unable to locate the missing .38 caliber revolver. He concluded that Defendant had not told him the truth about the location of the revolver.

Chief Koivunen returned to the St. Louis County jail to book out the Defendant. Defendant provided that he was agreeable to leave with Chief Koivunen and St. Louis County Sheriff's Deputy Tarr,[4] at which time Defendant was fitted with shackles and placed in the front passenger seat of Deputy Tarr's squad car. Chief Koivunen's report had nothing about whether he informed Defendant that he thought Defendant had lied to him, and at the evidentiary hearing,

---

[4] At the hearing, Chief Koivunen could not recall specifically whether Deputy Tarr was also present during the first instance in which Chief Koivunen searched the outside, exterior wall of Defendant's apartment. Although it's unclear whether Deputy Tarr was present with Chief Koivunen during the first outside search, or whether Deputy Tarr accompanied Chief Koivunen for another look at the outside of the building prior to returning to the St. Louis County jail to book out the Defendant, the fact has no bearing on the suppression issues raised by the Defendant.

he testified that he could not recall whether he had made any such statement to Defendant—Chief Koivunen stated that he may have told Defendant that he couldn't find the compartment at issue. Chief Koivunen did not recall Deputy Tarr saying anything to Defendant at that time.

Deputy Tarr testified that neither he nor Chief Koivunen confronted Defendant about the fact that they thought he had been lying about the hidden compartment. Deputy Tarr provided that they did not have much conversation with the Defendant at all and only took him into custody to travel back to the apartment. Although Deputy Tarr was aware of some other crimes he was investigating that Defendant was suspected of having been involved in, he did not confront or ask Defendant about any of those crimes at the time they booked out Defendant from the St. Louis County jail. In fact, Deputy Tarr testified that prior to the seizure of the .38 caliber revolver at issue in this case, Deputy Tarr did not question the Defendant about anything at all.

After leaving the St. Louis County jail with Defendant, Deputy Tarr drove the vehicle while Chief Koivunen sat in the back seat behind Defendant. The car ride from the jail to Defendant's apartment was approximately two-minutes. During that time, Chief Koivunen testified that he did not ask him any questions. He testified that if he had asked Defendant any questions related to the case, it would have been reflected in his police report. He did not recall Deputy Tarr asking Defendant any questions during the car ride. When Chief Koivunen, Deputy Tarr, and Defendant arrived at the scene, Chief Koivunen took out a digital recorder and recorded his conversation with Defendant. Prior to asking any questions, Chief Koivunen again confirmed with Defendant that Defendant had been read his rights, that he understood them, and that he waived his right to an attorney. Defendant once again explained that he believed the .38 caliber revolver could be accessed from the outside of the apartment through the hole in the wall, but stated that if it was necessary to go into Defendant's apartment, he would give consent for

Chief Koivunen and Deputy Tarr to enter into the apartment with him. (Gov't Ex. 2C at 1). Chief Koivunen testified that Defendant showed no reluctance for the officers to enter Defendant's apartment, and in fact, Defendant led the way into the apartment.

The door to the apartment was still open from when it was kicked open the previous evening, and Chief Koivunen and Deputy Tarr followed Defendant into his apartment. Defendant immediately proceeded to the kitchen area, where he lifted a small cabinet to reveal the .38 caliber revolver at issue, as well as, a black powder gun. (See Gov't Ex. 2D). Chief Koivunen, Deputy Tarr, and the Defendant were in the apartment for no longer than 10 minutes. During that time, Chief Koivunen and Deputy Tarr did not question Defendant.

After the guns were recovered from the Defendant's apartment, Deputy Tarr took the Defendant back to the St. Louis County jail, while Chief Koivunen took the guns with him to the Eveleth police department.[5]

Chief Koivunen testified at the hearing that he had extensive prior experience observing people high on drugs (specifically methamphetamine) or alcohol, and that he had experience where he had arrested people while they were high on drugs or alcohol. He explained that obvious signs that can frequently be observed with people high on methamphetamine are jitters, shaking, looking around, dilated pupils, clenching or grinding of the teeth, and picking at the skin. Obvious signs that a person is intoxicated from alcohol include bloodshot or watery eyes, slurred speech, odor of alcohol, slowed reflexes, staggering, and falling.

---

[5] Later in the day, Deputy Tarr interviewed Defendant. This interview, however, was in relation to the black powder gun found at Defendant's apartment that was completely unrelated to Chief Koivunen's investigation at issue in this case. At the hearing, the Government represented that it does not intend to introduce into evidence at trial any of the statements made during the interview with Deputy Tarr or any evidence seized as a result of any statements made by Defendant during that interview. On that basis, Defendant, in this case, has not specifically sought to suppress any statement made by Defendant during the interview with Deputy Tarr or any evidence seized as a result of information obtained during the interview with Deputy Tarr.

At the time of Defendant's initial arrest the evening of May 6th, though his personal interaction with Defendant was brief, Chief Koivunen had not noticed any of the signs that would indicate that Defendant was high on methamphetamine or intoxicated from alcohol use. Similarly, at the time of the interview in the early morning of May 7th, with regard to Defendant's behavior, Chief Koivunen again did not notice anything out of the ordinary. Defendant exhibited no jitteriness, no sweating, no dilation of pupils, or picking on anything; Defendant appeared to Chief Koivunen to be completely sober. During the interview, Defendant commented to Chief Koivunen that he had been using methamphetamine the previous week and made reference to "being up over a week." Defendant also stated that he had been using methamphetamine on May 6 "all day." (Gov't Ex. 2B at 13). Although Defendant was never tested for drugs on either May 6 or May 7, during the interview, Defendant never commented or stated that he was intoxicated or high at the time of the interview.

During the interview, Defendant made references to specific legal terms such as "aiding and abetting in the commission of a crime." (Gov't Ex. 2B at 7). In the context of talking about what things would be found at the residence, Defendant stated that he was not concerned about any "dope" the police would uncover because it couldn't be used against him: "Dope can't be used against me because it was on the search warrant. I know that." (Id. at 9). He continually responded coherently to the questions asked of him and did not exhibit any indication that he was having a difficult time understanding any questions. However, during the interview, he yawned on several occasions.

7

Chief Koivunen also testified that Defendant had a lengthy criminal history dating back to the early 1980s, including at least 15 to 20 prior arrests, as part of which law enforcement would have routinely read Defendant his Miranda rights.[6]

## II. DISCUSSION

**A. Defendant made a voluntary, knowing, and intelligent waiver of his Miranda rights during the first interview with Chief Koivunen at the jail interview room**

A defendant's waiver of his Miranda rights must be made voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. 436, 444 (1966). When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court must inquire whether:

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

The court "must examine both 'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002) (quoting United States v. McClinton, 982 F.2d 278, 282 (8th Cir. 1992)). The United States Supreme Court has previously explained "that coercive police activity is a

---

[6] The Court also notes that during the interview, in response to the question of whom he had been with, Defendant stated that he "Plead[s] fifth." (Gov't Ex. 2B at 1). However, he continued to answer questions asked of him and never sought to terminate the interview. At the hearing, Chief Koivunen testified that he understood, in the context of the conversation, that Defendant simply did not want to talk about whom he had been with—not that he did not want to answer any more questions regarding any topic. At no other instance during the interview did Defendant seek to invoke his right to counsel or terminate the interview, and Defendant has not argued that he at any time during the interview attempted to invoke his right to counsel, nor does the Court find that he did.

8

necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was *involuntary* and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (emphasis in original) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was voluntary, knowing, and intelligently made, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." Syslo, 303 F.3d at 866.

As the Eighth Circuit has previously explained, "[s]leeplessness, alcohol use and drug use are relevant to our analysis, but 'intoxication and fatigue do not automatically render a confession involuntary.'" United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (quoting United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990)); see also Turner, 157 F.3d at 555 (refusing to adopt a per se rule for intoxication and finding that the defendant's confession was voluntary even though the defendant was intoxicated by PCP and later exhibited "bizarre" behavior and signs of mental illness). "[T]he test is whether these mental impairments caused the defendant's will to be overborne." Casal, 915 F.2d at 1229.

The Government argues that Defendant was given a Miranda warning and that Defendant voluntarily waived his Miranda rights. Specifically, when the Defendant provided a somewhat ambiguous answer about whether he wished to talk ("Might as well"), Chief Koivunen asked for a clear yes or no answer, to which Defendant responded "Yes." The Government further argues that Chief Koivunen did not pray on any particular prejudices of the Defendant, nor did he try to trick him. It maintains that there was no evidence that Defendant was intoxicated during the

9

interview, but even if he had been, the standard of voluntariness does not merely look to whether the Defendant was intoxicated but, instead, whether Defendant understood the questions posed to him and voluntarily answered them. Here, Defendant demonstrated that he understood the questions posed to him, the Government argues, based on the attempted manipulative behavior he exhibited, the manner in which he obviated the truth, and the questions he posed to Chief Koivunen regarding legal matters. It further argues that, merely because the Defendant may have been speaking in a soft voice, this does nothing to indicate that he did not understand the questions posed to him.

Defendant argues that his waiver of his <u>Miranda</u> rights was not voluntary, knowing, and intelligent. Defendant asserts that he was in custody for the duration of the whole night, he was awake for eight days before his arrest, and he had been using methamphetamine all day on the day before the interview. As evidence of the fact that Defendant was high, Defendant cites to the instances in the interview in which he occasionally yawned, and his "strange" demeanor.[7]

The Court finds, on the present record, that Defendant's purported lack of sleep for several days and claimed recent use of methamphetamines did not cause his will to be overborne.[8]

In <u>Casal</u>, the defendant had used methamphetamine the evening of his interrogation and had not slept in five days. 915 F.2d at 1227. The court rejected the defendant's argument that his statements were involuntary because of his recent methamphetamine drug use and lack of sleep, finding that there "was evidence that [the defendant] did not act like an intoxicated

---

[7] Defendant's arguments, at the close of the evidentiary hearing, were not specific as to what constituted "strange" behavior at the time of the May 7th early morning interview.

[8] The Court also finds, and Defendant does not argue to the contrary, that there was no evidence that Chief Koivunen engaged in any coercive tactic or exhibited any threatening behavior. He was dressed in civilian clothing and did not carry a firearm.

person" and that the defendant demonstrated an ability to say "no" to the officers when he did not want to speak on a particular subject. Id. at 1229.[9]

In Gaddy, the defendant claimed he had not slept the night before his arrest and had taken two or three shots of gin, two pain relievers, 1600 milligrams of muscle relaxers and smoked a blunt of mixed marijuana and cocaine. 532 F.3d at 786. In rejecting the defendant's argument that his confession to law enforcement was involuntary, the court relied on testimony that the defendant appeared aware and coherent and that he "did not tell them that he was tired, intoxicated or under the influence of drugs," as well as his extensive contact with law enforcement on prior occasions. Id. at 788-89.

In United States v. Contreras, the defendant informed the interviewing police officers, and a separate witness at the suppression hearing testified, that the defendant had "used methamphetamine the night before [his arrest and interview] and had used marijuana the day of [it]." 372 F.3d 974, 977 (8th Cir. 2004). In rejecting the defendant's argument that his consent to the search of his home and the statement he made were not voluntary, the court relied on testimony from the officers that the defendant "appeared to be sober and in control of his faculties at the time he consent[ed]" and that substantial evidence showed he "was lucid at the time he gave consent and that he understood the questions asked of him." Id. at 977-78.

In this case, Chief Koivunen testified that Defendant appeared coherent and did not exhibit any signs of intoxication at either the time of Defendant's arrest on the evening of May 6th or during his interview the morning of May 7th. During the interview on May 7th, Defendant

---

[9] Although the court in Casal also relied on some evidence that the police were unaware of the defendant's lack of sleep and recent drug use until the conclusion of the interview (a fact the defendant in that case disputed), in the absence of any evidence that the police in this case somehow abused the fact that they knew this information, of which there is none, the Court does not believe that Chief Koivunen's awareness of Defendant's purported lack of sleep and recent drug use has any material impact on the analysis in this case. See United States v. Contreras, 372 F.3d 974, 977 (8th Cir. 2004). Moreover, as in Gaddy, Defendant never told Chief Koivunen that he was under the influence of drugs at the time of the interview. 532 F.3d at 788.

11

exhibited an understanding of the questions he was asked, and he continually provided responsive answers. When he couldn't remember a specific fact, he stated as such. Furthermore, he made several comments and asked several questions that demonstrated his understanding of legal procedures and terms. These specific references to legal principles demonstrate that Defendant not only understood the questions posed to him but that he also had some understanding as to the general nature of the proceedings that pertained to him. Moreover, on at least one occasion, he demonstrated an ability to say "no" when he did not want to discuss a particular subject: i.e., who was with him at the time he broke into the two vehicles. Additionally, Defendant had an extensive criminal history record and had been arrested numerous times, which suggests that he had extensive prior experience with questioning by law enforcement. See United States v. Muhlenbruch, 634 F.3d 987, 998 (8th Cir. 2011); United States v. Gallardo-Marquez, 253 F.3d 1121, 1123 (8th Cir. 2001). Finally, in the absence of any statements by Defendant at any point during the interview that he was too tired to continue the interview, the Court does not believe that his mere yawning on a few occasions demonstrates that his statements were not otherwise voluntary under the totality of the circumstances of the present case. See United States v. Mims, 567 F. Supp.2d 1059, 1080-81 (D. Minn. 2008) ("during his interview, [the defendant] never mentioned that he was too tired or hungry to continue, and while he yawned and stretched occasionally during the proceeding, it is apparent that he was coherent and in control of his faculties. There is nothing to indicate that [the defendant's] waiver of his *Miranda* rights was not voluntarily, intelligently, or knowingly given.").

For the reasons stated above, the Court finds that Defendant's waiver of his Miranda rights was made voluntarily, knowingly, and intelligently, and thus, the statements he made

during the first interview by Chief Koivunen on the morning of May 7th, in the jail interview room, need not be suppressed.[10]

## B. The Search of Defendant's apartment did not violate Defendant's Fourth Amendment Rights.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). "Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement." United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010).

The Government argues that the search of the Defendant's apartment on the morning of May 7th was proper based on Defendant's voluntary consent. It argues that prior to seeking consent to search the Defendant was given a second, proper Miranda warning: e.g., by Defendant's positive responses to Chief Koivunen's questions whether Defendant remembered

---

[10] Although Defendant did not argue that the police made any specific promises that overcame his will, Chief Koivunen testified, and the hearing record shows, that Chief Koivunen made no promises to Defendant that Defendant would be able to see Angie if he cooperated; nor are any references by Chief Koivunen that he would merely see what he can do enough to constitute a promise. See United States v. Klenk, 2005 WL 2708346, at *4 (D. Kan. Oct. 20, 2005) (explaining that the officers' statements that they would "see what they could do" did not "constitute promises . . . that would undermine the voluntariness of the defendant's statement"); Williams v. Norris, 576 F.3d 850, 868 (8th Cir. 2009) (finding that promises that officer would talk to the prosecutor about the defendant's cooperation are not promises of leniency); United States v. Soto, No. 07-CR-223 (PJS/JSM), 2007 WL 3120816, *16 (D. Minn. Oct. 23, 2007) (finding that the officer's statements that he would make sure the charging attorney knew that the defendant was cooperative did not constitute a promise and the defendant's subjective "belief to the contrary [was] irrelevant."). Moreover, even if any promise had been made, which the Court finds was not, here, Defendant specifically stated that he did not believe that Chief Koivunen would keep any promise to let him see Angie, even if we assume one had been made. See United States v. Gregoire, No. 09-275 (ADM/RLE), 2009 WL 5216844, at *22 (D. Minn. Dec. 29, 2009) (finding that the defendant was not influenced by any implied promises).

receiving the Miranda warning less than an hour before and whether he had understood and waived those rights. But even if that were not sufficient to constitute a new Miranda warning, the Government argues, the questioning was a mere continuation of the initial interview (from less than an hour before) as part of which the officers were not required to once again provide Defendant with a Miranda warning. After having been once again advised of his rights, the Government argues, Defendant voluntarily took the officers into his apartment and showed them where the guns were located.

Defendant acknowledges that he had authority to provide for a consent of the May 7th search of his apartment, but he argues that "coercive" tactics[11] were employed to obtain the Defendant's consent thus rendering his consent to search the apartment involuntary. Defendant generally cites to the involuntariness of the earlier recorded interview at the jail,[12] the absence of any police reports in the record before the Court, and the lack of a recording of any conversation Defendant may have had in the squad car on the drive between the St. Louis County jail and his apartment. Although the officers involved testified that Defendant was not questioned and made no statements prior to giving his recorded consent to re-enter his apartment on May 7th, Defendant argues, the Government has nonetheless failed to meet its burden to demonstrate that Defendant was not coerced to consent. Thus, he argues, his consent to the search must be found to be involuntary, the search of his apartment on May 7th was illegal, and evidence seized during the search must be therefore suppressed.

The Government responds that for the Court to find that any statements made by the officers worked to coerce Defendant to consent to a search in light of the officers' testimony that

---

[11] Defendant's arguments, at the close of the evidentiary hearing, were not specific as to what constituted "coercive" tactics by either Chief Koivunen or Deputy Tarr.
[12] The Court rejected this characterization of his previous statement given earlier on May 7th for the reasons stated in Section II.A, above.

they did not question Defendant prior to his consent and the absence of any evidence in the record to the contrary, the Court would need to speculate and would have to find that the officers were lying in their testimony in order to find as Defendant proposes.

The Court finds that, in regard to the May 7th search of Defendant's apartment, it need not even reach the issue of the voluntariness of Defendant's consent. "Of course, if the officers had a valid search warrant, no consent was required to make the search lawful." Bumper v. North Carolina, 391 U.S. 543, 553 (1968).

Here, Defendant has not argued, and the Court does not believe there would be any reason to argue, that the search warrant to search Defendant's apartment, (see Gov't Ex. 1), was invalid at the time that the police searched Defendant's apartment on the evening of May 6. If the search warrant was still valid for the follow up search of Defendant's apartment the morning of May 7th, then Defendant's consent is not required.

The Eighth Circuit, citing the Sixth Circuit, has previously explained that "entries onto premises on successive days pursuant to a single warrant" are not necessarily illegal when "[t]he authority of the warrant ha[s] not expired and . . . the return search [is] not beyond the scope of the Fourth Amendment." See United States v. Carter, 854 F.2d 1102, 1107 (8th Cir. 1988) (citing United States v. Bowling, 351 F.2d 236, 241 (6th Cir. 1965), cert. denied, 383 U.S. 908 (1966)). In Carter, the police had executed a search of the defendant's hotel room pursuant to a valid search warrant obtained based on information police had gathered from an earlier, consented entry into the hotel room. 854 F.2d at 1104-1105. After one of the officers presented the defendant with an inventory list of the items seized from the hotel room, the defendant informed the officer that "$4,000 hidden under the mattress had been omitted." Id. at 1105. The police then returned to the hotel and seized the cash. Id. In rejecting the defendant's challenge

to the "return search," the court explained that "the question [was] not whether there were two entries pursuant to the warrant, but rather, whether the second search was a continuation of the first," and found the search proper because "the warrant listed money as an item to be recovered and the search took place several hours later." Id. at 1107 (citing United States v. Huslage, 480 F. Supp. 870, 875 (W.D. Pa. 1979)).

In Bowling, upon which the Eighth Circuit relied in Carter, the police had executed a search warrant at approximately 6:15 p.m. on April 2, 1963, as part of which they recorded serial numbers for numerous items but seized only one. 351 F.2d at 240. After having cross-referencing the serial numbers acquired from the defendant's residence with police lists of stolen equipment, the officers returned the next morning with a truck and seized and removed other machines from the defendant's basement. Id. In rejecting the defendant's argument that the search was improper, the court explained that "certainly the mere fact that the time of [the search warrant's] first use was promptly noted thereon did not vitiate its powers as of the following morning." Id. at 241.

Similarly, in Huslage, upon which the Eighth Circuit also relied in Carter, the police conducted an initial search of the defendant's vehicle at approximately 4:10 a.m. on July 9, 1979, during which they did not seize any evidence. Huslage, 480 F. Supp. at 874. Although the warrant, by its terms, had to be served by 5:00 a.m., at approximately 10:00 a.m. that morning, after the victim of the crime the defendant was charged with provided that she had seen the pistol in the defendant's vehicle, the police conducted a second search of the vehicle. Id. "Aided by natural light," the police found the pistol they were seeking in the vehicle. Id. In rejecting the defendant's argument that the search violated his Fourth Amendment rights, even though the Court found that the warrant according to its terms had expired, the court held that

16

> the fact that the police made two entries into the [vehicle] pursuant to a single search warrant does not require a finding that the police violated the Fourth Amendment rights of the defendants. The question is not whether the police went through the door of the vehicle twice, but rather, whether the search conducted at 10:00 A.M. was a continuation of the search that had been initiated at 4:10 A.M.

Id. at 875 (citing Bowling, 351 F.2d at 241). It emphasized that the second search was made within nine hours of when the search warrant was issued and within twelve hours after the police had arrested the defendants and "[t]he probable cause supporting the search had not become stale." Id.

As noted by the Sixth Circuit, "[m]ost of the federal courts of appeals to have considered the question . . . have held that a single search warrant may authorize more than one entry into the premises identified in the warrant, as long as the second entry is a reasonable continuation of the original search." United States v. Keszthelyi, 308 F.3d 557, 568 (6th Cir. 2002) (citing Carter, 854 F.2d at 1107, as well as opinions from the Fourth Circuit, Ninth Circuit, and Eleventh Circuit).

Here, the search warrant for Defendant's apartment was signed and authorized on May 6, 2012. As provided by Minn. Stat. § 626.15, the search warrant was valid for 10 days. See United States v. McElrath, 759 F. Supp. 1391, 1393 (D. Minn. 1991) ("Under Minnesota law, the search warrant remained valid for ten days."). The search warrant specifically listed the .38 caliber revolver that the police initially searched for and were unable to find during the search of Defendant's apartment on the evening of May 6, and which was recovered during the search of Defendant's apartment on the early morning of May 7. As in Carter, after the initial search, police obtained information from Defendant himself that an item the police were seeking to seize pursuant to a valid warrant remained in the apartment, based upon which the officers decided to conduct another limited search less than 12 hours from the initial search. Given the late hour of

17

the day in which the initial search began and the early morning hour of the second search, which took place immediately after properly learning from the Defendant[13] more about the specific location of the missing .38 caliber revolver, and because there was a valid search warrant for the exact gun in the exact premises that was now corroborated with additional details provided by Defendant, the Court finds that the subsequent search in the early morning of May 7th was a mere continuation of the late evening search on May 6th. Consequently, the May 7th search, being pursuant to a valid warrant, did not require Defendant's consent and did not violate Defendant's Fourth Amendment rights.

The Court is by no means suggesting that law enforcement may freely enter, on numerous occasions, a location specified in a valid search warrant for the purpose of recovering additional evidence until the search warrant actually expires. Rather, the Court finds that under the circumstances specific to this case, the subsequent search was a mere continuation of the initial search for which neither consent nor a new and separate search warrant was required. This is not a case in which police, after a thorough and full search, leave the location authorized to be searched and an officer different from those who executed the search warrant later searches the residence again acting on a mere hunch, such as a strong feeling that there was "something there that had not been located." Cf. United States v. Keszthelyi, 308 F.3d 557, 563 (6th Cir. 2002).

Therefore, the Court finds that Defendant's motion to suppress any evidence obtained as a result of the search of his apartment on May 7th should be denied.[14]

---

[13] See Section II.A, above.
[14] Even if the Court were to consider the issue of the voluntariness of Defendant's consent, the Court would find on the present record that Defendant's consent to search his apartment on the morning of May 7, 2012, was made voluntarily and was not the product of police coercion or threats.

"The government bears the burden of proving by a preponderance of the evidence that consent to search was voluntary." United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011). "The ultimate question is whether the

18

individual's will has been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been involuntary." Id. (internal quotation marks omitted). "The voluntariness of consent is evaluated in light of the totality of circumstances." United States v. Jimenez, 478 F.3d 929, 932 (8th Cir. 2007). The Court considers the following characteristics of the person who provided consent: 1) age; 2) general intelligence and education; 3) whether they were intoxicated or under the influence of drugs when consenting; 4) whether they were informed of their Miranda rights; and 5) whether they were aware, through prior experience of the protections afforded to suspected criminals by the legal system. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). The Court also considers the following with regard to the environment in which the person provided consent:

> [whether the person] (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; (6) either objected to the search or stood by silently while the search occurred.

Id.; United States v. $231,930.00, 614 F.3d 837, 845 (8th Cir. 2010). The factors are not applied "mechanically" but serve as a guide to the Court's analysis. Chaidez, 906 F.2d at 381.

Here, as to Defendant's characteristics, Defendant was middle age and, as already explained, had extensive prior experience with the criminal justice system. Although Defendant may have consumed drugs the previous day, as Section II.A already discusses, there is no evidence that Defendant was under the influence of any drugs or alcohol at the time he gave consent; to the contrary, Defendant appeared coherent and lucid throughout the day on May 7th. Additionally, although the officers did not verbatim read the Defendant's Miranda rights again, they again inquired whether he had been read his Miranda rights less than an hour before and confirmed that he understood them and waived them.

As to the environment in which Defendant provided consent, although Defendant was in custody, from the time that he was booked out of the St. Louis County jail by Chief Koivunen until he reached his house, the car ride lasted for only a couple of minutes. Chief Koivunen and Deputy Tarr both testified that they did not question Defendant on any matters related to this case from the time that they took him into custody at the St. Louis County Jail until Chief Koivunen turned on his portable digital recorder and recorded his conversation with Defendant prior to when Defendant led the officers back into his apartment. Other than asking the Court to speculate as to facts that would be contrary to the officers' testimony at the hearing, Defendant has not offered any evidence to suggest that the officers improperly coerced or threatened Defendant in order to obtain consent to enter his apartment on May 7th. Similarly, there is no evidence in the record that either of the officers made any representations or promises during the car ride—indeed, they testified that at most, they may have made some "small talk." Next, although the conversation took place in Deputy Tarr's vehicle, which may have been somewhat of a intimidating environment while Defendant was shackled, the vehicle was parked in a public place. Finally, and of particular importance, is that Defendant actually led the officers into the apartment and without any prompting physically lifted a small cabinet himself to reveal the revolver. (See Gov't Ex. 2D). Chief Koivunen testified that Defendant immediately proceeded to the cabinet that had concealed the gun and did not hesitate or delay once he was in the apartment. Furthermore, the record demonstrates that when he was asked if he would consent to a search of his home, Defendant readily agreed. For these reasons, even if the Court were to reach the issue of the voluntariness of Defendant's consent, the Court would find that the Government has met its burden of demonstrating that Defendant's consent was given freely and voluntarily. See United States v. Willie, 462 F.3d 892, 896-97 (8th Cir. 2006) (finding that the government met its burden even though the defendant "may have been under the influence of methamphetamine at the time of his arrest," he was not issued Miranda warnings before he gave consent, and was under arrest and handcuffed at the time he gave his consent).

## III. CONCLUSION

1. Based on the foregoing, and all the files, records and proceedings herein,

   **IT IS HEREBY RECOMMENDED** that Defendant's motions to suppress evidence and statements [Docket Nos. 20 and 21] be denied.

Dated: December 10, 2012

s/Leo I. Brisbois
LEO I. BRISBOIS
United States Magistrate Judge

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by December 24 2012**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.